**Ricky Dan HASHOP, Cathy Hines–Torregano, Ubaldo Garcia, and James Spencer, Jr.**

v.

**ROCKWELL SPACE OPERATIONS COMPANY.**

Civ. A. No. G–94–111.

United States District Court,
S.D. Texas,
Galveston Division.

Nov. 9, 1994.

---

F. Eric Fryar, Susman Godfrey, Houston, TX, for plaintiffs.

Ernest E. Figari, Jr., Gary David Eisenstat, Figari & Davenport, Dallas, TX, for defendant.

## ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

KENT, District Judge.

This is an action brought by Plaintiffs Ricky Dan Hashop ("Hashop"), Cathy Hines–Torregano ("Hines–Torregano"), Ubaldo Garcia ("Garcia"), and James Spencer, Jr. ("Spencer") pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* In addition, Plaintiff Hashop has also brought an FLSA retaliatory discharge claim against Defendant Rockwell Space Operations Company ("RSOC") pursuant to 29 U.S.C. § 215. Before the Court now are cross-motions for summary judgment brought by Plaintiffs and Defendant. Plaintiffs urge the Court to grant partial summary judgment against Defendant RSOC on the grounds that it does not have an affirmative defense of exemption under 29 U.S.C. § 213. By contrast, Defendant argues that the Court should grant summary judgment against all of Plaintiffs' claims on the grounds that (1) Plaintiffs are exempt from the overtime compensation provisions of the FLSA because they are exempt "professionals" under 29 U.S.C. § 213, (2) Plaintiffs' FLSA claims are barred by the appropriate statute of limitations, and (3) Plaintiff Hash-

op's retaliatory discharge claim is invalid. For the reasons stated below, Plaintiffs' Motion for Partial Summary Judgment is **GRANTED** and Defendant's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

### 1. Factual Background

On January 13, 1993, Plaintiffs filed this purported class action, seeking recovery for uncompensated overtime and retaliation (Hashop only) under the FLSA. This Court denied class certification by an Order on April 6, 1994 and restricted Plaintiffs to their individual claims. Plaintiffs are Network Communication Systems ("NSS") Instructors, who train Space Shuttle ground control personnel during simulated missions. Plaintiffs simulate, and provide instruction on, all communications, data, tracking, and telemetry information that ordinarily flows between the Space Shuttle and the Johnson Space Center Mission Control Center ("Mission Control").[1]

Mission Control in Houston, Texas tracks, maintains contact with, and controls the Space Shuttle through a network of satellites, ground stations, the Goddard Space Flight Center in Maryland ("Goddard"), and the White Sands NASA Ground Terminal in New Mexico ("White Sands"). This network makes it possible for Mission Control to send or receive tracking data, telemetry, commands, and voice communications with the Space Shuttle. During simulations, Mission Control remains unchanged; the actual equipment and control personnel are the same for both simulated and real missions. The astronauts and flight crew are aboard the Shuttle Mission Simulator ("Simulator") instead of the actual Space Shuttle. The NSS Instructors provide the link between Mission Control and the shuttle mission Simulator during simulations. As NSS Instructors, Plaintiffs simulate all tracking data, commands, and voice communications between the Simulator and Mission Control. The NSS Instructors also simulate the activi-

---

**1.** Hashop joined RSOC in June, 1990; Hines in September, 1990; Spencer in October, 1990; and Garcia in October, 1990. Each Plaintiff was classified as an exempt professional by RSOC when originally hired.

ties that would ordinarily occur at Goddard, White Sands, and remote ground stations.

Plaintiffs' overall job goal as NSS Instructors is to train Mission Control personnel by simulating the foregoing systems in integrated simulations of Space Shuttle missions. This goal comprises four discrete activities: scripting, console work, post-console work, and support activities. The first of these, scripting, involves the development of the outline for simulated missions. Representatives from each group within RSOC's training division meet to develop mission scripts. RSOC's customer, the Simulation Supervisor ("Simsup"), moderates these meetings. Depending on their work schedules, each Plaintiff takes his or her turn serving as the NSS representative at script meetings unaccompanied by a supervisor.

Once the script is complete, Plaintiffs run the "console," from which they perform NSS functions during simulated missions. The console consists of nine computer screens, three keyboards, light pens, and voice communication interfaces. The console allows Plaintiffs to monitor and alter NSS functions to achieve mission objectives. Plaintiffs also make and receive voice calls with the Simsup, Simulator instructors, Mission Control, and the simulation control area adjacent to Mission Control. In addition, NSS Instructors are responsible for helping to "troubleshoot" problems that arise with the NSS equipment during simulations.

After the simulated mission is over, Plaintiffs take part in debriefing Mission Control. During debriefing, Plaintiffs tell Mission Control personnel whether or not they handled simulated NSS anomalies correctly. In addition, they try to determine if their simulated anomalies faithfully reproduce real ones; if a simulated anomaly is not as realistic as it can be, Plaintiffs attempt to change future simulations.

Finally, Plaintiffs also engage in various activities that support their goal of training Mission Control personnel for upcoming missions. These tasks involve writing workbooks and technical guides and travelling to sites to learn more about the network they simulate.

Plaintiff Hashop worked at RSOC from June, 1990 to November, 1993, when he was terminated. Hashop claims that he began voicing his concerns about uncompensated overtime over two years before he was discharged, primarily in the first half of 1991, when he called the RSOC ombudsman. He also confronted his supervisor, Roger Lawley, at a staff meeting in the same time period.

During the latter part of 1991, Hashop received a Performance Appraisal that stated he did not meet all of his job requirements, though the same report also praised him for other aspects of his job performance. He was consequently placed on a formal Performance Improvement Plan ("PIP"), which he successfully completed ahead of schedule by early 1992. This result was confirmed by an internal memo from Lawley that also warned Hashop to sustain his new level of performance.

Throughout 1992, Hashop managed to do just that, but beginning in 1993, his problems with follow-through on the job began to resurface. Jerry Angeley, the supervisor of RSOC's training support group, warned Hashop verbally and in writing about his problems on May 5, June 23, and July 29, 1993. On September 2, 1993, Hashop received a negative performance rating and was placed on a second PIP, which he successfully completed on October 6, 1993. Hashop complained that his performance was not being fairly evaluated, and he accused Angeley of lying about his performance. As a result, Hashop decided to secretly tape-record a conversation with Angeley in October, 1993.

In that same month, Hashop complained about his PIP and Angelely's alleged lying to RSOC's Human Resources Department member Melissa Vaughn. Notably, Hashop did not complain to Vaughn about overtime compensation. Vaughn investigated Hashop's complaint and listened to his secretly recorded audiotape of Angeley. When she learned that Hashop's recording violated both NASA and RSOC rules, Vaughn informed Lawley, who concluded that the accusations against Angeley were unfounded. Believing Hashop's conduct to be disruptive

to the employer-employee relationship, Lawley and Vaughn determined that Hashop should be terminated. On November 4, 1993, RSOC discharged Hashop.

### 2. Standard for Summary Judgment

▆▆▆ Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. A fact is material if its resolution in favor of one party might affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A genuine issue of material fact exists if there is a genuine issue for trial that must be decided by the trier of fact. In other words, summary judgment should not be granted if the evidence indicates that a reasonable fact-finder could find in favor of the nonmoving party. Id. See also Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

▆▆▆ In ruling on a Motion for Summary Judgment, the Court must accept the evidence of the nonmoving party and draw all justifiable inferences in his favor. Credibility determinations, weighing of the evidence, and the drawing of reasonable inferences are left to the trier of fact. Anderson v. Liberty Lobby, supra, 477 U.S. at 255, 106 S.Ct. at 2513.

▆▆▆ Under Fed.R.Civ.P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once this burden is met, the burden shifts to the nonmoving party to establish the existence of a genuine issue for trial. Matsushi-

ta, supra, 475 U.S. at 585–87, 106 S.Ct. at 1355–56; Leonard v. Dixie Well Serv. & Supply, Inc., 828 F.2d 291, 294 (5th Cir. 1987).

Where the moving party has met its Rule 56(c) burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita, supra, 475 U.S. at 586–87, 106 S.Ct. at 1356 (quoting Fed.R.Civ.P. 56(e)) (emphasis in original).

### 3. Analysis

#### 1. The Statute of Limitations Claim

▆▆▆ As an initial matter, RSOC argues that Plaintiffs' FLSA claims are barred by the applicable statute of limitations.[2] All FLSA actions are governed by a two-year statute of limitations unless the Defendant is found to have willfully violated the FLSA, in which case the appropriate time limitation is three years. 29 U.S.C. § 255(a). It is undisputed in this case that all four of the Plaintiffs were initially hired well in excess of either of these statutory time limits. Nevertheless, the Court finds that in this case Plaintiffs' claims are not time-barred.

▆▆▆ The issue in an FLSA case such as the one now before the Court is whether the claim made by the Plaintiffs is a continuing violation of the Act or whether the alleged decision not to pay overtime compensation is a single violation of the statutory requirements. The Fifth Circuit has stated that the continuing violation theory encompasses two kinds of cases. The first includes cases in which the original violation occurs outside

2. The complex briefs and motions in this case contain a good deal of discussion as to whether the two-year or three-year statute of limitations should be applied. However, Defendant RSOC's Motion for Summary Judgment fails to request the Court to determine which of the two time periods should properly be applied in this case; it merely states that "Plaintiffs' claims for uncompensated overtime should be dismissed in

their entirety because they are barred by the FLSA statute of limitations." (Defendants' Motion for Summary Judgment, Instrument # 16, at 18). This Court will not address questions not properly brought before it, and in deciding that Plaintiffs' claims are *not* time-barred, the Court does not decide which of the two limitation periods should apply in this case.

the statutory period but which is closely related to subsequent violations that are not time-barred. In this kind of case, a Plaintiff may recover for all violations on the theory that they constitute one continuing type of violation. *Hendrix v. Yazoo City*, 911 F.2d 1102, 1103–04 (5th Cir.1990). The second type of case involves an initial violation that also occurs outside the statutory period but which is repeated later. In this type of case, each subsequent violation begins a new statute of limitations period, and recovery may be had for those violations that occur within a period of limitations. *Id.*

By contrast, a single violation occurs where a facially neutral method of administering an initial act of discrimination merely gives effect to that original violation. For example, the discriminatory adoption of a facially neutral seniority system is a single violation that triggers the statute of limitations rather than a continuing violation renewed with each paycheck. *Lorance v. AT & T Technologies, Inc.*, 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989). Likewise, when a city unilaterally reduces the base salary of its firefighters in direct violation of a Congressional order not to do so, it constitutes a single violation of the FLSA. *Hendrix, supra*, 911 F.2d at 1103.

In this case, the Court finds that if the FLSA has been violated at all, it is a continuing violation renewed with each paycheck rather than a single violation subsequently barred by the statute of limitations. The Fifth Circuit has found in a similar FLSA case that "[a] cause of action accrues at each regular payday immediately following the work period during which the services were rendered for which the wage or overtime compensation is claimed." *Halferty v. Pulse Drug Co.*, 821 F.2d 261, 270, *mod. on other grounds*, 826 F.2d 2 (5th Cir.1987). In *Halferty*, an ambulance dispatcher was classified as an independent contractor rather than an employee as required by the FLSA, thereby allowing the employer to claim that the employee was exempt from the FLSA overtime provisions. *Id.* at 262–63. Likewise, the Circuit has also found that a violation of the Equal Pay Act, which is enforced through the FLSA, creates a separate cause of action

at each regular payday. *Hodgson v. Behrens Drug Company*, 475 F.2d 1041, 1050 (5th Cir.1973), *cert. denied*, 414 U.S. 822, 94 S.Ct. 121, 38 L.Ed.2d 55 (1973). More recently, the Eleventh Circuit also found that where an employee claims to have been improperly classified as exempt from the FLSA's overtime provisions, "[e]ach failure to pay overtime constitutes a *new* violation of the FLSA." *Knight v. Columbus, Georgia*, 19 F.3d 579, 581 (11th Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 318, 130 L.Ed.2d 280 (1994). In *Knight*, the Eleventh Circuit stated that it is not the employer's *rationale* for refusing to pay overtime compensation that creates the employee's cause of action, but the actual failure to receive overtime payments with each paycheck when they have accrued. *Id.* Because this case is squarely within the parameters set forth in *Halferty*, the Court finds that the claims brought by the Plaintiffs in this case constitute a continuing alleged violation of the FLSA renewed with each paycheck. Consequently, Defendant's Motion for Summary Judgment on the grounds that Plaintiffs' claims are time-barred is **DENIED.**

### 2. Plaintiffs' Exempt Status as "Professionals"

As a second ground for summary judgment, Defendant argues that Plaintiffs' claims for uncompensated overtime should be dismissed because Plaintiffs are exempt professionals under the FLSA. The FLSA exempts "any employee employed in a bona fide executive, administrative, or professional capacity ..." 29 U.S.C. § 213(a)(1). The employer bears the burden of proving an employee's exempt status. *Paul v. Petroleum Equipment Tools Co.*, 708 F.2d 168, 169 (5th Cir.1983). As with all exemptions to the FLSA, the employer's claim of exemption must be construed narrowly and in favor of the employee. *See Brennan v. Greene's Propane Gas Service, Inc.*, 479 F.2d 1027, 1032 (5th Cir.1973).

Determination of professional status is guided by regulations issued by the Secretary of Labor and the Administrator of the Wage and Hour Division. When an employee earns more than a minimum weekly salary

of $250, these regulations allow an employer to use a "short test" to meet its burden of proving an employee's professional status. Under this test, the employer must show that the employee's "primary duty consists of the performance of work requiring knowledge of an advanced type in a field of science or learning, or work as a teacher in the activity of imparting knowledge ... which includes work requiring the consistent exercise of discretion and judgment." 29 C.F.R. §§ 541.3(e) & 541.315.[3]

Defendant RSOC first argues that Plaintiffs are exempt professionals under this "short test" because of their status as instructors whose primary duty is the scripting, console, post-console, and support work by which Plaintiffs train Mission Control personnel for the NASA Space Shuttle program. Defendant claims that this is an "activity of imparting knowledge" under 29 C.F.R. § 541.3(a)(3). (See Defendant's Motion for Summary Judgment, at 7).

The Court finds Defendant's argument on this point to be utterly without merit. 29 C.F.R. 541.301(g)(1) clearly states that a requisite for the teacher exemption is that the employee be engaged "in this activity as a teacher in the school system, or educational establishment or institution by which he is employed." It is patently clear that RSOC is not a "school system" or an "educational establishment"; instead, it is a large, for-profit corporation engaged in the aerospace industry. Although Defendant relies on *Wilks v. District of Columbia*, 721 F.Supp. 1383 (D.D.C.1989) as support for its position, that case is wholly inapposite to the facts at hand. In *Wilks*, teachers in a correctional institution were held to fall within the professional exemption because they were certified

by the District of Columbia Public Schools and were full-time, professional educators. In this case, however, there is no contention that any of the Plaintiffs are certified teachers. Thus, although *Wilks* suggests that courts may be willing to extend the teacher exemption beyond traditional schools under some circumstances, nothing in this case suggests that any of the Plaintiffs have ever been trained as teachers or can even arguably be said to fall within the guidelines of 29 C.F.R. 541.301(g)(1). *See Wilks, supra,* 721 F.Supp. at 1385 (stating that "[t]he ordinary meaning of the term 'educational institution' is 'school.' ").[4]

Nevertheless, the remaining two requirements of the professional exemption—the performance of work requiring knowledge of an advanced type and the consistent use of discretion in the performance of that work—present this Court with the difficult task of determining whether the duties and qualifications of the highly skilled aerospace personnel in this case make them technicians or "professionals" for FLSA purposes. Defendant claims that the Plaintiffs in this case are professionals because of their educational background and duties; Plaintiffs counter this assertion with the claim that they "are truly the assembly line workers of the Information Age." (Plaintiff's Motion for Partial Summary Judgment, Instrument # 19, at 3).

There are three elements of the "learned" professional requirement:

[1] the knowledge [must] be of an advanced type. Thus, generally speaking, it must be knowledge which cannot be attained at the high school level.

[2] it must be knowledge in a field of science or learning[, and]

---

**3.** 29 C.F.R. 541.3(e) requires that an employee qualifying for the professional exemption must be paid on a salary basis. Defendant has presented a detailed analysis of such a basis for Plaintiffs' salaries, and it is undisputed that the Plaintiffs are salaried employees. (See Defendant's Motion for Summary Judgment, at 2–3).

Defendant also points out that Plaintiff Hines' pay was reduced after an extended medical leave in March and April, 1994 pursuant to 29 C.F.R. § 541.118(a)(3), which allows deductions for absences for sickness or disability once an employee has exhausted his or her leave allowance

under the employer's compensation plan. Plaintiffs have made no response to this argument in any summary judgment response, and the Court therefore finds that Defendant has borne its summary judgment burden on this point.

**4.** Although C.F.R. § 541.301(g)(2) applies the teacher exemption to instructors in aircraft flight and automobile driving, it seems clear that such employment is assumed to take place in some organized "school-like" setting. This is manifestly different from the corporate, in-house training operation found in this case.

[3] [t]he requisite knowledge . . . must be customarily acquired by a prolonged course of specialized intellectual instruction and study.

29 C.F.R. § 541.301(b), (c), (d). The Court is guided in its interpretation of this regulation by an attachment to a letter prepared by the Office of Personnel Management, the agency charged with the enforcement of the FLSA's overtime provisions against government agencies. The letter is meant to assist government agencies in classifying their employees for FLSA purposes. The FPM letter defines professional employees, at a minimum, as those who perform work that:

(a)(1) . . . requires knowledge in a field of science or learning customarily and characteristically acquired through education or training that meets the requirements for a bachelor's or higher degree . . . or [involves] work comparable to that performed by professional employees on the basis of specialized education or training and experience which has provided both theoretical and practical knowledge of the specialty, including knowledge of related disciplines and new developments in the field.

*Palardy v. Horner*, 711 F.Supp. 667, 670 (D.Mass.1989) (quoting Federal Personnel Manual System Letter No. 551–7).

 By their very terms, neither the C.F.R. regulation nor the FPM letter *requires* that employees have college degrees to qualify for professional status, despite Defendant's apparent assumption to the contrary; they may perform work *comparable* to that done by other professional employees. Nevertheless, professionals must acquire their advanced knowledge through a "prolonged course of specialized intellectual instruction and study." 29 C.F.R. § 541.301(d). In the vast majority of cases, such a course of study must be a *prerequisite* to entry into the field in question. *Id.* Thus, broadcast journalists are not "professionals" for FLSA purposes because the study of journalism is not required to become a competent journalist. *Freeman v. Nat'l Broadcasting Co.*, 846 F.Supp. 1109, 1154–55 (S.D.N.Y.1993). Likewise, the academic requirement of a bachelor's degree in one of the social sciences to become a probation officer does not make such officers "professionals" because the study of the social sciences is a general, rather than a specialized, academic training. *Dybach v. Florida Dept. of Corrections*, 942 F.2d 1562, 1565 (11th Cir.1991).

 In this case, the record suggests that no specialized course of instruction prior to employment by RSOC was required by the Defendant for employees to be eligible for admission to the NSS Instructor training program. This is not, however, equivalent to the Plaintiffs' claim that no specialized course of study was required to become an actual NSS Instructor. It is undisputed that the Plaintiffs in this case did, in fact, have college degrees in fields such as electronic engineering and mathematics.[5] In addition, many of them studied physics, analog and digital circuits, computer programming, and radio frequency communications. (Defendant's Motion for Summary Judgment, at 4). Although the Court is genuinely impressed by the prodigious accomplishments of these Plaintiffs, its legal determination of their status is not determined by the credentials they brought to their jobs but rather by the qualifications required by their employer.

 All parties acknowledge that RSOC's employee requisition forms state that the prospective NSS Instructor must have a "BSEE, Electronics Eng. Technology, CS [computer science], Physics or Math degree or equivalent experience or knowledge of the NSS and/or MCC operations." (Plaintiffs' Motion for Partial Summary Judgment, at 15–16). Clearly, no specific course of study is required by this list; indeed, no degree in *any* subject is a prerequisite as long as the candidate has "equivalent experience" or "knowledge" of the operations. Deposition

---

5. Plaintiffs make much of the fact that three of them had B.S. degrees from DeVry Institute, a trade school that is not fully accredited. However, the Court does not find this a defining fact. Whatever its merits relative to traditional, fully-accredited colleges, a DeVry B.S. degree is clearly a degree beyond the high school level. Whether such a degree qualifies the Plaintiffs as engineers or not, it is clear that FLSA exemptions are based on the activities conducted in a job, not the job title itself. *See Brock v. National Health Corp.*, 667 F.Supp. 557, 563 (M.D.Tenn.1987).

testimony of Roger Lawley, RSOC's manager of the training department that includes NSS Instructors, makes this clear. Lawley stated that some of his exempt employees might have degrees in the life sciences like biology or paleontology or might have no degree at all. (Lawley Depo., Plaintiffs' Motion for Partial Summary Judgment, at 5–6). Although Lawley stated that an NSS Instructor candidate should have a background in "electronic concepts," he explicitly stated that an intelligent person with a degree in mathematics who had no training in electronics or physics would still be eligible. Id.

Nevertheless, NSS Instructors are not certified as Instructors merely on the basis of the qualifications they bring to the initial candidacy itself; they must also undergo an extensive and highly specialized in-house training program that may last up to one year. This curriculum includes subjects such as "Orbiter Communications Systems," "Ground Network Systems," "Space Network Systems," and "Console Pages and Loops." Plaintiffs were required to take a test on each topic and to achieve a score of at least 70% to obtain NSS Instructor certification. The tests involved questions relating to both the practical and theoretical aspects of the subjects involved, and Plaintiffs were required to provide written answers, descriptions, and diagrams. (See Defendant's Motion for Summary Judgment, at 4–5).

The Court believes that this specialized training program brings Plaintiffs within the specialized learning portion of the "professional" exemption. Plaintiffs object that RSOC's instruction is merely an "apprenticeship" or "on-the-job training" program, a form of training prohibited by 29 C.F.R. § 541.301(d). That regulation is meant to exclude "quasi-professions as journalism in which the bulk of the employees have acquired their skill by experience rather than by any formal specialized training." But, the program in question patently does *not* consist of an "on-the-job" training method where employees learn by doing. Indeed, it is inconceivable to this Court that anyone could learn to operate a simulation system for something as complex as the Space Shuttle program by "hands-on" training or an "ap-

prenticeship" program, both of which clearly refer to methods of instruction far more appropriate in journalism or the mechanical arts. *Cf. Palardy, supra,* 711 F.Supp. at 669–71 (finding that on the job training included teaching skills such as the repair, testing, and overhaul of naval ship equipment).

In deciding this issue, the Court is aware that the rapid development in technology may require that employees receive specialized training subsequent to their formal education to execute the complex jobs they are called on to perform. 29 C.F.R. § 541.301(e)(2) states that "[t]he areas in which professional exemptions may be available are expanding" as knowledge and technology develop. This is certainly true insofar as it relates to the learning required to perform the complex tasks undertaken by the Plaintiffs. To this Court's knowledge, there is no undergraduate degree program in Space Shuttle Operations which the Plaintiffs in this case could have taken to qualify them to be NSS Instructors. Thus, the extensive, highly specific course of study offered by RSOC, combined with the general technical background required for NSS Instructors, certainly brings the Plaintiffs out of a mere apprenticeship form of program into the knowledge of an advanced type required for the professional exemption.

■ This does not, however, make Plaintiffs "professionals" for FLSA purposes. They must also consistently exercise discretion in their work to qualify. 29 C.F.R. § 531.305(a) requires that a professional employee "must perform work which requires the *consistent* exercise of discretion and judgment in its performance" (emphasis added). Professional work is thus characterized by the application of special knowledge "with discretion and judgment" and is not "[p]urely mechanical or routine work." 29 C.F.R. § 541.305(b). Based on these criteria, and narrowly construing the exemption in favor of the employees, the Court does not believe that the Plaintiffs in this case have exercised the kind of discretion and judgment neces-

sary to bring them within the professional employee exemption.[6]

■ In deciding this issue, the Court recognizes that the professional exemption found in 29 C.F.R. § 541.301 *et seq.* does not contain an explanation or an elaboration of what is meant by the consistent use of discretion beyond the passages quoted above. However, the Court believes that, at a minimum, such discretion must involve the authority to make basic decisions that affect the fundamental operation of the enterprise in question without seeking guidance from superiors as a matter of course. In *Paul, supra,* 708 F.2d at 171, for example, the Fifth Circuit found that an airline pilot was an exempt professional because he had the ability to decide when weather conditions might make take-off impossible and to decide whether a plane was airworthy. Such decisions go to the very operation of an aircraft and suggest that discretion must involve more than the mere application of skills and techniques acquired through an employee's training; it must also have some fundamental, independent ability to effect the operation the employee is involved in to distinguish a "professional" from a highly trained technician. *Cf. Martin v. Penn Line Service, Inc.,* 416 F.Supp. 1387, 1390 (W.D.Pa.1976) (construing the broader, but similar, discretion requirement for the administrative exemption to demand more than a reliance on skills acquired by training).

It is undisputed that during the Simulation scripting process, one of the Plaintiffs is designated the NSS expert and attends a meeting unaccompanied by a supervisor. Defendant claims that during these meetings the Plaintiff-expert exercises discretion by providing technical guidance and advice to the Simsup. (See Defendant's Brief in Support of Motion for Summary Judgment, at 10). The Court fails to see how this goes beyond the duties of a highly trained technician. Jerry Angeley, the supervisor of RSOC's training support group, stated that all the inputs on the script are approved by the Simsup and that most of the proper responses to malfunctions are listed in a manual. (Angeley Depo., Plaintiffs' Motion for Partial Summary Judgment, at 43, 47). The parameters of each malfunction are dictated by the capabilities of the Simulators and by the script scenario, which the NSS Instructor does not create. (Plaintiffs' Motion for Partial Summary Judgment, at 7). Thus, the Plaintiffs certainly use their advanced training and experience to make decisions, but only within a well-defined framework that the Court finds inconsistent with "discretion and judgment." *Cf. Martin, supra,* 416 F.Supp. at 1390 (holding that helicopter pilots whose flight decisions were made within prescribed work assignments did not use discretion under the administrative exemption).

Defendant also argues that during the simulation itself, Plaintiffs are the expert on NSS operations and must use their discretion to make last-minute changes and to advise the Simsup on the technical feasibility of changes. Again, however, the Court finds no meaningful distinction between such activities and those that would be performed by a highly trained technician. Plaintiffs point out that the configuration procedures are mechanical tasks, and Plaintiff Hashop testified that most of the simulation activity is routine work. (Id. at 7–8). There is no evidence that NSS Instructors have the discretion to change how or when simulations

---

6. The Court notes that Plaintiffs have cited with alarming frequency the C.F.R. guidelines for "discretion" as it applies to the *administrative* exemption, 29 C.F.R. § 541.201 *et seq.,* as if it applied to the wholly separate and distinct C.F.R. category of professional exemption without further explanation. Similarly, Plaintiffs rely on *Dalheim v. KDFW–TV,* 706 F.Supp. 493 (N.D.Tex.1988), *aff'd.,* 918 F.2d 1220 (1990), without pointing out to the Court that that case never once addresses the issue of discretion as it relates to the *professional* exemption. 'Although Defendant has vigorously complained about this misstatement of the proper C.F.R. sections, it has also erred in this regard. (See Defendant's Response to Plaintiffs' Motion for Partial Summary Judgment, at 10). For example, Defendant has urged the Court to be guided by *Donovan v. Flowers Marine, Inc.,* 545 F.Supp. 991 (E.D.La. 1982) without pointing out that *Donovan* was not concerned with the professional exemption at all.

This Court, which has one of the heaviest civil dockets in the country, is dismayed that both parties in this case have felt free to flood the Court with an unwarranted amount of deposition and affidavit testimony, but have not taken the time to make consistently clear and accurate statements of the law.

are operated or to use their discretion in any way other than to make technical recommendations within the parameters set out by the script or the Simsup.

Finally, Defendant argues that Plaintiffs show discretion in the fact that during the debriefing, they tell Mission Control personnel whether or not the NSS anomalies were correctly handled.[7] In addition, Defendant claims that Plaintiffs also engage in discretionary activity by writing workbooks and by travelling to remote sites to gather information. The Court does not find this to be sufficient evidence of a consistent use of discretion to say that Plaintiffs are exempt professionals as a matter of law. When NSS Instructors provide feedback to Mission Control, they merely respond to Mission Control personnel based on responses received during the simulation. Plaintiff Hashop agreed to the suggestion that during the debriefing he would say: " 'You did the right thing. You did the wrong thing; here's what we suggest you do next time if this occurs again,' things like that, in response to whatever the MCC person did." (Hashop Depo., Defendant's Motion for Summary Judgment, at 45). This is not so much an exercise of "discretion" as it is technical feedback based on the perceptions of a highly trained technician. Nothing suggests that the Plaintiffs are authorized to make any independent decisions effecting the operation of the debriefing or that they have any discretion to act outside the parameters of the carefully defined debriefing routine. Likewise, Hashop himself makes clear that any research done in relation to writing or revising manuals was heavily guided by the NSS Instructors' supervisor, who set up the guidelines within which the research was to be conducted. (*Id.* at 54).

The Court once again acknowledges the genuine accomplishments of these skilled Plaintiffs, who perform important and advanced work in a critical industry. However, it agrees with them that their actual duties as NSS Instructors do not rise to the level of professionals for FLSA purposes when the exemption is narrowly construed in their favor and against RSOC. Thus, Plaintiffs' Motion for Partial Summary Judgment is **GRANTED,** and Defendant's Motion for Summary Judgment in regard to the exempt status of Plaintiffs is **DENIED.**

### 3. *Plaintiff Hashop's Retaliatory Discharge Claim*

Plaintiff Hashop has also brought an individual claim against RSOC, claiming that he was discharged in violation of 29 U.S.C. § 215, which prohibits the discharge or discrimination against any employee for filing a complaint under the FLSA. In order to succeed on such a retaliatory discharge claim, Hashop must prove the same elements that would be required under a Title VII claim. *Strickland v. MICA Information Systems*, 800 F.Supp. 1320, 1323 (M.D.N.C. 1992) (citing *Brock v. Richardson*, 812 F.2d 121, 123 (3d Cir.1987)). A Title VII claim requires intentional discrimination, and under the familiar *McDonnel Douglas/Burdine* framework, the Court employs a three-part test designed to determine the motivation of the defendant in taking the challenged action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255 n. 10, 101 S.Ct. 1089, 1095 n. 10, 67 L.Ed.2d 207 (1981). First, the plaintiff is required to establish a prima facie case wherein he must establish the elements of the discrimination claim. If the plaintiff meets these requirements, a presumption of discrimination arises. *Bodenheimer v. PPG Industries, Inc.*, 5 F.3d 955 (5th Cir.1993).

Second, the defendant may then rebut this presumption by articulating a legitimate, nondiscriminatory reason for the alleged discriminatory action. *Olitsky v. Spencer Gifts, Inc.*, 964 F.2d 1471 (5th Cir. 1992). An employer meets this burden by proffering admissible evidence of an explana-

---

**7.** Defendant also points to the fact that Hashop considered himself the "ideas man" for NSS Instructors as evidence of "initiative and imagination." (Defendant's Motion for Summary Judgment, at 12). This argument fails on two counts. First, how Plaintiff subjectively perceived himself is irrelevant to his exercise of discretion. Secondly, nothing in § 541.301 *et seq.* suggests that "initiative and imagination" have anything to do with "discretion."

tion that would be legally sufficient to justify a judgment for the employer. *Guthrie v. Tifco Indus.*, 941 F.2d 374, 376 (5th Cir. 1991). The defendant need not *persuade* the trier of fact that there was no intentional discrimination; he need only produce evidence on that point. *St. Mary's Honor Center v. Hicks,* — U.S. —, —, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407, 416 (1993).

■■■■ Third, once the employer satisfies this burden, the presumption of discrimination established by the employee's prima facie case dissolves. *Burdine, supra,* 450 U.S. at 255 n. 10, 101 S.Ct. at 1095 n. 10. The employee's burden of persuasion then arises, and the plaintiff must produce evidence that the employer's proffered reasons are mere pretexts, the real reason for the action having been based on an impermissible animus. *Id.* at 256, 101 S.Ct. at 1095; *Bodenheimer, supra,* 5 F.3d at 959.

■■■■ In this case, the Court finds that even where the record as a whole is looked at in the light most favorable to the nonmoving party, no reasonable fact finder could determine that the Plaintiff has made a prima facie case of retaliatory discrimination. A plaintiff must show three things to establish a prima facie case of retaliation: (1) he engaged in an activity protected by Title VII; (2) an adverse employment action followed; and (3) there was some causal connection between the activity and the adverse action. *Collins v. Baptist Memorial Geriatric Center,* 937 F.2d 190, 193 (5th Cir.1991). The plaintiff need not show that the protected activity was the sole factor motivating the adverse action, but he must show that "but for" the protected activity, he would not have been subjected to the action he claims is discriminatory. *Id.; Jones v. Flagship Int'l,* 793 F.2d 714, 724 (5th Cir.1986).

The parties in this case hotly contest the question of whether Hashop's internal—and informal—complaint bring him within an activity protected by the FLSA. Yet, assuming *arguendo* that such a showing has been made, and also assuming that an adverse employment action followed, Hashop's claim is still without merit as a matter of law. Plaintiff cannot show in this case that "but for" the protected activity he would not have

been terminated. *Jones, supra,* 793 F.2d at 724. The only evidence Plaintiff has produced on this point is supervisor Lawley's agreement that Hashop's secret tape-recording of Angeley was not "automatically grounds for discharge." (Lawley Depo., Plaintiffs' Motion for Partial Summary Judgment, at 47). It is obvious, however, that the fact that Hashop's actions were not necessarily automatic grounds for termination is *not* the same as saying that they were not sufficient grounds and that "but for" Hashop's informal complaints about overtime work he would not have been terminated.

Plaintiff Hashop has failed to point out that his own summary judgment evidence clearly shows that RSOC had ample grounds for dismissal. A March 15, 1992 company regulation clearly states that certain actions by employees "will be sufficient cause for and may result in corrective action up to and including discharge." Included among the list of prohibited acts are two rules Lawley listed as grounds for dismissal in his November 17, 1993 Internal Team Letter on Hashop's termination. These are: Rule 7, which prohibits the possession of recording devices on company property without authorization; and Rule 10, which forbids disruptive or unprofessional behavior. (See Plaintiffs' Motion for Partial Summary Judgment, PX15). In addition, a June 21, 1989 Management Instruction letter from NASA's General Counsel (which applies to NASA contractor employees) clearly states that no recording devices may be used in conversations. *Id.*

These regulations provide clear evidence that RSOC had the authority under its internal regulations to discharge Hashop for secretly tape-recording his conversation with Angeley. Indeed, there is no evidence in this case that Hashop was anything more than an "at will" employee of RSOC under the Texas state presumption that all employees are "at will" unless otherwise shown. *Sabine Pilot Service v. Hauck,* 687 S.W.2d 733, 735 (Tex. 1985). While Hashop's termination may have been within the discretion of RSOC management, that does not mean that it could not have served as an independent cause for his firing. Thus, there is absolutely no showing whatsoever in this case that

"but for" Hashop's complaints he would not have been discharged.

 Yet even if the Court assumes that Plaintiff has made out a prima facie case on these facts, Hashop's claim still fails as a matter of law. Plaintiff fails to point out that under *St. Mary's, supra,* —— U.S. at ——, 113 S.Ct. at 2742, 125 L.Ed.2d at 407, RSOC can rebut a presumption of discrimination by showing a legitimate, nondiscriminatory reason for Hashop's termination. Importantly, RSOC need not convince the trier of fact that its proffered reason was the *actual* motivation for its action; it need only show reasons which, if taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action. *Id.*

For the reasons stated above, the Court finds that RSOC has clearly shown such a reason. Not only did Hashop violate internal regulations of the company, he also conducted himself in a manner that RSOC found to be a breach of trust. (Defendant's Brief in Support of its Motion for Summary Judgment, at 17). As an "at will" employee, both of Hashop's violations are justifiable grounds for termination, and the Court finds that RSOC has demonstrated a nondiscriminatory reason for its action. This is an especially compelling conclusion in this case because RSOC has failed to take any adverse action against the remaining Plaintiffs in this case for their roles in this FLSA complaint. The Court therefore finds that Defendant RSOC has shown that Plaintiff Hashop's retaliatory discharge claim is invalid as a matter of law, and Defendant's Motion for Summary Judgment on the retaliation claim is **GRANTED.**

### *4. Conclusion*

For the reasons stated above, the Court finds that Plaintiffs have demonstrated that Defendant RSOC does not have an affirmative defense that the Plaintiffs are exempt employees, and Plaintiffs' Motion for Partial Summary Judgment is **GRANTED.** Consequently, Defendant's Motion for Summary Judgment is **DENIED** insofar as it relates to the claim that Plaintiffs are exempt professionals for FLSA purposes. Defendant's Motion is also **DENIED** insofar as it argues that Plaintiffs' claims are barred by the stat-

ute of limitations. Finally, Defendant's Motion for Summary Judgment against Plaintiff Hashop's retaliatory discharge claim is **GRANTED,** and Hashop's FLSA discharge claim is hereby **DISMISSED WITH PREJUDICE.**

Furthermore, all other relief not specifically granted herein is **DENIED.** Insofar as Defendant has made objections to, or motions to strike, affidavit and deposition testimony produced in this case, such motions are also **DENIED.** All parties are to bear their own costs. It is further **ORDERED** that the parties file no further pleadings on this issue in this Court, including motions to reconsider and the like. Instead, the parties are instructed to seek any further relief to which they feel themselves entitled in the United States Court of Appeals for the Fifth Circuit, as may be appropriate in due course.

**IT IS SO ORDERED.**